The Commonwealth ex rel. negro LEWIS *against* HOLLOWAY.

1814.

*Philadelphia,*
*Tuesday,*
*January* 4.

THIS was a *habeas corpus* to the jailer of *Philadelphia* county, to bring up the body of negro *Lewis*. The return to the writ stated, that he was held by virtue of a commitment by an alderman dated the 29th of *December* 1813, which commitment was founded upon an oath, that *Lewis* was the slave of *Langdon Cheves* esquire of *South Carolina*, and had absconded from the service of his master.

The domestic slave of a member of congress from *South Carolina*, who during the recess of congress attends the family of his master in this state, where it had taken a temporary residence, does not acquire freedom by being retained in the state longer than six months.

Upon the hearing it was agreed, " that *Langdon Cheves* " was a native citizen and resident of *South Carolina*, and " had never resided any where else but as a sojourner; that " he was a member of congress from that state, and had " sojourned in *Pennsylvania* for the purpose of more con- " veniently discharging his duties as a member of congress, " but without any intention to become domiciled there; that " negro *Lewis*, who was a domestic servant, had always " been his slave while residing in *Pennsylvania*, and ab- " sconded from his service in *Germantown* about the 1st of " *December* 1813; that sometime in *March* 1813, after con- " gress rose, Mr. *Cheves* came to *Pennsylvania* bringing " *Lewis* with him; that he rented a house in *Germantown*, " and lived there with his family till some time in *Decem-* " *ber* 1813, when he went to *Washington* with his family; " and that *Lewis* lived with him *more than six months* in " *Pennsylvania*, but absconded before Mr. *Cheves* left the " state for *Washington*." Upon these facts,

*Rawle* and *Lewis* for the negro, contended that he was free, by virtue of the tenth section of the act of 1st *March* 1780, which enacts that " no man or woman of any nation " or colour, except the negroes and mulattoes who shall be " registered as aforesaid, shall at any time hereafter be " deemed, adjudged or holden within the territories of this " Commonwealth, as slaves or servants for life, but as free " men and free women." 1 *Smith's Laws* 495. The exception contained in that section, namely, of " the domestic " slaves attending upon delegates in congress from the other " *American* states, foreign ministers and consuls, and per-

1814.

COMMON-
WEALTH
*v.*
HOLLOWAY.

" sons passing through or sojourning in this state &c." they argued did not embrace the present case, because it was taken out of the exception, by the proviso, that " such do-" "mestic slaves be not (except in the case of members of " congress, foreign ministers and consuls) retained in this " state longer than six months." Negro *Lewis* they said was to be considered as the slave of a sojourner for more than six months.

1. The basis of the act of 1780, is the right of every person to freedom, therefore the exception must be construed strictly. Under the old confederation, members of congress had a diplomatic character. They were in the nature of foreign ministers, with whom they are coupled in the act. The intent of the act was to give to the members of that congress while sitting, and representing their respective states, the privilege of keeping their own servants, and of bringing with them the rights which were derived from their own law. But when the present federal constitution was adopted, the old one was done away, and there ceased to be any *delegates* in congress. The act of assembly is therefore not applicable to the present constitution.

2. The privilege given by the law is in consideration of, and is to be limited by, the *public functions* of the members of congress. It is confined to an actual attendance *in* congress, with an allowance of reasonable time *eundo, morando, et redeundo;* and does not extend to a residence during the recess of congress. The words are not *members* of, but *delegates in* congress, and the narrowest construction should be made.

3. Still less can it be understood to extend to, and to except the case of a family residing here during the recess, for their personal convenience, when the congress meet in another state. The spirit of the law is as averse to such a construction as the letter. *Pennsylvania* voluntarily imparted the privilege to members of congress, because congress was then held in *Pennsylvania,* and it was necessary of course that the delegates should reside there. The act contemplates the case of a congress in *Pennsylvania only;* it speaks of slaves *attending* upon delegates in congress. To enlarge the exception, is to violate the intention of the legislature. Residence in this state not being necessary, while congress

sits at *Washington*, the reason of the exception fails, and the exception itself must therefore fail.

*Sergeant* contra. The intent and the true policy of this state in the act of 1780, was to pay respect to the other members of the confederation in the person of their representatives. It was a policy essentially necessary to the peaceful intercourse of the states, and almost to their equality. There is therefore no propriety in giving a narrow construction to what so evidently flowed from a liberal spirit.

1. The change of the confederation for the present constitution, makes no change in the law. So far as the object and intention of the law are concerned, a member of the old congress and of the present congress are the same. It is still a confederated government. The same respect is due by this state, to the southern states and their representatives. The exception was not made in consequence of any temporary interest which this state had in the confederation, or of any particular virtue in the delegates to that body; but in consequence of its general interest in the success of the union, and of the general necessity of granting this accommodation to representatives in the common legislature. This state itself has declared that the law extends to the present congress. The constitution of the *United States* was adopted by *Pennsylvania* on the 12th of *December* 1787. On the 29th of *March* 1788, a law was passed, expressly recognizing the last exception to the tenth section of the act of 1780, as being then in force. 2 *Smith's Laws* 443.

2. The privilege of the member of congress is not limited to his attendance upon that body, or to his going and returning. The language is general, " slaves attending upon " delegates in congress." The verbal criticism upon this phrase, has no weight. In the last exception it is exchanged for " members of congress," and both are thus treated as convertible expressions. It is of great moment at times, for the dispatch of business in the vacation, for the more convenient discharge of other business, and in consequence of the state of the country, that members of congress should not return home after a session. The law may reasonably be considered as embracing such a case. In the present instance, there was a special session in *May* 1813. The war

prevented the return to *Charleston* by water. A residence in some of the middle states was therefore almost essential to Mr. *Cheves*, for he could not go in any manner before *May*, and two journeys by land after *May* and before the ensuing session, might have been impracticable. If the act had intended to restrict the privilege in the manner contended for, it would have used the language of the constitution in regard to arrests of members of congress. They are priviledged from arrest, " during their attendance at the session " of their respective houses, *and in going to, and in return-* " *ing from the same.*"

3. The law is not confined to the case of a congress in *Pennsylvania*. The words do not say so. The spirit of the law is certainly not so. And it is a complete answer to the suggestion, that when the act of 1788 recognized the last exception in the act of 1780, congress were actually sitting in *New York*.

TILGHMAN C. J. Negro *Lewis,* who is brought before us on this *habeas corpus*, was committed by Alderman *Keppele* as the slave of *Langdon Cheves* esquire, having absconded from his master's service. Mr. *Cheves* is a member of the house of representatives of the *United States*, from the state of *South Carolina*, and has never resided in this state, except as a sojourner. During the recess of congress he remained with his family, in a house which he rented in *Germantown*, in this state. *Lewis* was his slave, and employed as a domestic servant in his family during his stay at *Germantown* for more than six months, between *March* and *December* last. It is contended that in consequence of this residence, *Lewis* acquired his freedom by virtue of the act "for the gradual abolition of slavery," (passed 1st *March* 1780). The question depends on the 10th section of the act, by which it was enacted, that "no man or woman of any "nation or colour, except the negroes or mulattoes which "shall be registered as aforesaid, shall at any time hereafter "be deemed, adjudged or holden within the territories of "this Commonwealth as slaves or servants for life, but as "free men or free women, *except the domestic slaves attend-* "*ing upon delegates in congress from the other American* "*states*, foreign ministers and consuls, and persons passing

" through or sojourning in this state, and not becoming resi-
" dent therein, and seamen employed in ships not belonging
" to any inhabitant of this state, nor employed in any ship
" owned by any such inhabitant, provided such domestic
" slaves be not alienated or sold to any inhabitant, nor
" (except in the case of members of congress, foreign minis-
" ters and consuls) retained in this state longer than six
" months." The plain meaning of this section appears to be,
that the domestic slaves attending upon members of con-
gress, (other than members from *Pennsylvania*) are excepted
from the general provision which confers freedom. But
several ingenious arguments have been urged to prove that
this act has a more refined and less obvious meaning. First
of all, it is said, that having been passed before the adoption
of the present federal constitution, it can have no application
to the congress under the present constitution. I cannot
perceive the force of this objection. To be sure, the con-
gress of the *United States* under the old confederation, is in
many respects different from the present congress. But the
object and foundation of both is the same; they are both
founded on a federative union, and the object of both is the
general defence and welfare; both require that the members
representing the several states should meet at some one
place, and it is as necessary that the members from the
southern states in the present congress should be attended
by their domestics, as it was for the members of the old
congress. In fact I do not recollect to have heard of this
distinction before, and considering that congress sat ten
years in this city under the present constitution, during all
which time the members from the southern states were
attended by their slaves without molestation, there is strong
reason for supposing that the construction now contended
for is contrary to that which has been generally received.
And that it is contrary to the construction of our own
legislature, appears from the third section of the act " to ex-
" plain and amend the act for the gradual abolition of
" slavery," passed 29th *March* 1788, a few months after
the present federal constitution had been ratified by this
state. In this section it is enacted, " that no negro or mu-
" latto slave, (except as in the last exception of the tenth
" section of the original act is excepted) shall be removed

" out of the state." Now the last exception in the tenth
section, relates to *members of congress*, foreign ministers and
consuls; so that the proviso in their favour was considered
as still in force. The next position of the counsel for
the *habeas corpus* is, that our act is confined to mem-
bers of congress, *during the time of its session*, allowing a
reasonable time for going and returning. The expression of
the act is, *delegates in congress;* but I take this to be the
same as *delegates to congress*, or in other words members
of congress, and that this is the meaning of the law is cer-
tain, because, in the proviso in the last part of the same
section, *members of congress* are the words used. It is next
contended, that whatever may be the literal meaning of the
words, the real object of the law was to give to members of
congress the benefit of their slaves during the time of their
attendance on their public duty *only*. I agree that it is fair
to construe the law according to its meaning, provided that
meaning is deduced not from conjecture, but from the words
of the law; at the same time I am not for adhering to *words*,
so far as to produce consequences too absurd or incon-
venient, to be supposed to have been intended by the legis-
lature. But I see no absurdity or inconvenience in giving
to these words their obvious meaning, which will only con-
fer on members of congress the privilege of being served by
their domestics during the time that they remain members,
whether congress shall be sitting in this or any other state.
On the contrary, I see great inconvenience in reducing the
southern members to the necessity of giving up their resi-
dence in this state during the recess of congress, or losing
the service of their domestics. In the case of Mr. *Cheves,*
this inconvenience would be very great indeed, because
there was a session of congress between *March* and *De-
cember,* his return to *Charleston* by *water* was cut off, and it
was impossible to say whether the events of the war might
not have induced the president of the *United States* to con-
vene the congress before the month of *December.* We all
know that our southern brethren are very jealous of their
rights on the subject of slavery, and that their union with
the other states could never have been cemented, without
yielding to their demands on this point. Nor is it conceiva-
ble that the legislature of *Pennsylvania* could have intended

to make a law, the probable consequence of which would have been the banishment of the congress from the state. I am therefore of opinion that the true construction of the law, is that which is impressed on the mind by its first reading, that is to say, that the domestic slaves of members of congress who are attending on the family of their masters even during its recess, gain no title to freedom, although they remain in the state more than six months, whether the seat of congress be in *Pennsylvania* or elsewhere. According to this construction the prisoner is to be remanded to the custody of the gaoler.

YEATES J. The present case appears to me, to be clearly within the words and spirit of the exception contained in the tenth section of the act of 1st *March* 1780. Mr. *Cheves* is a member of congress, and within the principle for which the privilege was introduced; and a different construction from that contended for on his behalf, would place him upon the footing of a mere sojourner, which is repugnant to the plain terms of the law.

I concur, that *Lewis* be remanded to the jailer.

BRACKENRIDGE J. concurred.

Prisoner remanded.